UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

**UNITED STATES OF AMERICA**                    Dkt #  1:09-CR-64

V

**NOEL DELAROSA**

MOTION FOR NEW TRIAL

Mr. Noel Delarosa, by and through his attorney Mark J. Keller, hereby moves under Rules 29 and 33 of the Federal Rules of Criminal Procedure for a new trial.  As basis for this motion Mr. Delarosa asserts that he was denied a fair trial due to ineffective assistance by his trial attorney, that he has newly discovered evidence which warrants a new trial and that, after considering the other portions of this motion, there is insufficient evidence to support a conviction.

**Introduction**:

On May 5, 2009, CI-81 attended a barbecue at the Perkins residence in Rutland, Vt.  After the cookout, CI-81 met with government agents to debrief.  The agents, with the help of CI-81, had been investigating drug conspiracies for over a year in the Rutland area.  During their debriefing of CI-81, the agents were surprised to learn that CI-81 was told by Mr. Brooker that he, Brooker, and others were soon to be indicted.  On May 7, 2009, CI-81, at the request of the government, approached Brooker again to determine the source of the leak.  Brooker told CI-81 that he had heard it from five or six persons.

On June 16, 2009, Brooker and others are indicted and arrested.  On June 16, 2009, Brooker was asked by government agents Jusianiec and McCoy if Mr. Brooker would supply information about the leak.  Brooker responded that someone close to the investigation provided the information and that he heard it from two to three sources.

In the latter part of 2009 government agents heard witnesses refer to an individual as Green Eyes as being a source of supply.  Thomas Luzader, on June 16, 2009, made this connection.  Mr. Luzader described Green Eyes as both Puerto Rican and fat and black and fat.



802-879-7211 | lawofficemjkeller@gmail.com | 11 Main Street, Essex Junctioin, VT 05452

Zachary Grant was also questioned on June 16, 2009.  He said that Brooker's source of supply was A-Rod.  A-Rod was described as Hispanic, possibly Puerto Rican, 5'5" in height with a light mustache and a tattoo on his forearm reading "Sky's the limit" or "No Limit."

After the June 16, 2009 interviews were concluded, the Vermont based agents learned from ATF Agent Mark Maher that Brian Domingo had an associate named Noel Delarosa who also had the nickname Green Eyes.  Agents Jusianiec and McCoy learned that Mr. Delarosa was a confidential informant (CI) for the DEA in New York for a portion of 2005 and from March 2007 until February 2010.  Mr. Delarosa believes that the agents jumped to the conclusion that Agent Ronald Arp, who handled Mr. Delarosa, mentioned the indictment to Mr. Delarosa who passed it on to Brooker.  So began a personal vendetta against Mr. Delarosa.

From June 16, 2009 on, Agent Jusianiec and TFO McCoy conducted every interview.  The two began to build the false case against Mr. Delarosa.

On July 20, 2009, the agents with AUSA Nolan conducted a proffer interview with Mr. Grant.  Although Mr. Grant's description of A-Rod as 5'5, mustached, tattooed, etc., did not match Mr. Delarosa, Mr. Grant was shown a photo of Mr. Delarosa and asked if he was A-Rod. The fact that Mr. Grant's description of A-Rod did not match Mr. Delarosa was not mentioned.

On October 20, 2009, a proffer interview was held with Thomas Luzader.  Mr. Luzader was shown a series of photographs.  Ms. Luzader was reported to have identified Mr. Delarosa as Green Eyes.  Nothing was mentioned in the ATF report regarding the inconsistency between Mr. Luzader's description of Green Eyes and Mr. Delarosa's description.

During the grand jury testimony of both Luzader and Grant neither were asked to describe Green Eyes or A-Rod.

On October 8, 2009, Jusianiec and McCoy and AUSA Nolan conducted a proffer interview with Mary Mirzaee.  She examined several photographs and identified one individual whom she believed was Brooker's connection.  That photograph has never been disclosed.  The defense does not know who was identified.

On January 14, 2010, TFO McCoy and Jusianiec accompanied by ATF Agent Maher and U.S. Probation and Parole Officer Petnaude appeared at Mr.

Delarosa's store.  The government's version of the discussion is contained in ATF Report 164.  The report does not mention that Mr. Delarosa, who was represented by Attorney Daniel Stewart, told the agents that he did not want to talk to them without his attorney present.  The two agents, who separated Mr. Delarosa and themselves from Maher and Petnaude, talked right past the request, ordered Mr. Delarosa into a chair and told Mr. Delarosa that he had "no choice."  The agents continued to pressure Mr. Delarosa and claim that he made certain incriminating statements.  Agent Maher was asked, in an email, to document what Mr. Delarosa said in the interview.  The defense was never given any report prepared by Agent Maher nor did he testify at the trial.

  Shortly after that meeting, in early February 2010, Mr. Delarosa was deactivated as a cooperating individual.  Working on his own, to improve his negotiating position, Mr. Delarosa continued to engage Teddy Howlett and succeeded in having Mr. Howlett offer to deliver guns and drugs to Mr. Delarosa. A recording of these discussions was given to Attorney Stewart as a negotiating aid.

  In April/May 2010, Mr. Delarosa was told by persons who were subjects involved in the conspiracy investigation that Jusianiec and McCoy were telling these individuals that Mr. Delarosa was a confidential informant for the DEA since 2007.  The agents were also asking the witnesses if Delarosa ever told them that Brooker was going to be indicted.  Mr. Delarosa told Attorney Stewart.  Attorney Stewart sent an email to AUSA Nolan asking Nolan if the agents were disclosing the CI status.  Mr. Nolan responded that Delarosa had disclosed that information himself, that their witnesses had talked among themselves and the government could use that information to obtain further cooperation.

  Mr. Delarosa was told that the government were telling Mr. Rivas, Mr. Canteen, Mr. Rodriguez, Mr. Howlett, Mr. Horick, Mr. Luzader, Mr. Robinson and Mr. Grant that Delarosa was involved one way or the other in setting them up.

  In May 2010, Mr. Delarosa, at the direction of Attorney Stewart, hired Mr. Kinsella to represent him.  In June 2010, Mr. Delarosa was indicted.

  Before the bail hearing, Mr. Delarosa has examined discovery information provided by a previously indicted individual.  During the review, Mr. Delarosa discovered the January 23, 2009 tape.  The tape, which will be discussed later in this motion, contained information which demonstrated what Mr. Kinsella termed



"outrageous conduct." Mr. Kinsella promised Mr. Delarosa that he would file a motion at the time of the bail hearing on that issue. Mr. Kinsella did not keep his promise. This was the first of many times that Mr. Kinsella did not zealously protect Mr. Delarosa's rights.

In this motion, Mr. Delarosa will present information which demonstrates that the United States government repeatedly engaged in improper conduct which, at times, rose to the level of perjury. Mr. Kinsella knew of this bad conduct but decided, over Mr. Delarosa's strong objection, not to bring this conduct to the court's and jury's attention.

**Ineffective Assistance of Counsel**
Use of CI-81 on January 23, 2009:

On January 23, 2009, the government used the services of CI-81 to make one handgun purchase and two drug purchases. The two drug purchases were described in detail in ATF report 47. Task Force Officer (TFO) McCoy detailed that he and Agent Jusianiec followed standard procedures when they used CI-81 by searching CI-81's person and vehicle before and after each buy. McCoy went on to detail that CI-81 was electronically monitored and surveilled before, during and after each buy. This information was then incorporated into the government's various supporting affidavits prepared by Agent Jusianiec.

The pre- and post-purchase searches and the surveillance, including the electronic monitoring, are critical to a proper undercover buy. The government must establish that the CI did not possess any drugs or contraband before the purchase and did not retain a portion of the purchased drugs for the CI after the buy. If the CI is not properly searched before and after the buy the entire buy lacks reliability due to the assertion that the CI may have brought the drugs with him thereby framing the potential seller. The same principle applies for the surveillance. If the CI is not kept under observation the CI may acquire the drugs from another source thereby destroying the reliability of the buy. That the CI was not thoroughly searched, that the CI was not properly followed and that the CI was not properly monitored is critical information that undercuts the reliability of each buy and the entire government case.

In the vast majority of cases in which confidential informants are used to buy illegal drugs the defense must rely upon the recording and the word of the



MARK J. KELLER
ATTORNEY AT LAW

802-879-7211 | lawofficemjkeller@gmail.com | 11 Main Street, Essex Junctioin, VT 05452

Case 1:09-cr-00064-cr   Document 1019   Filed 03/02/12   Page 5 of 18

officer.  The tapes, however, do not offer much assistance since the officer controls the recordings and only allows the recordings to contain the desired portions of the conversations.  In the Booker investigation, the officers apparently grew sloppy and neglected to turn off the tape.  As a result the officers were recorded causally talking with their supervisor about the evening.  It is in this conversation that we learn that the officers failed to properly surveil the CI-81.  It was only because the officers neglected to turn off the tape that the defense had a glimpse into the sloppy, unprofessional actions of the agents.

As troubling as this may have been, the agents intentionally excluded from ATF report 47 and the affidavits that the agents lost CI-81's vehicle during their surveillance of CI-81's vehicle.  Nor did the agents mention these facts during their grand jury testimony.  Certainly, a defense attorney would have a reasonable argument that the officers committed perjury when this information was intentionally omitted from the sworn documents and testimony.  It leaves open the obvious question: If the agents failed to follow proper procedures in this one instance and subsequently lied by omission what else were they doing during the rest of the investigation?

Unfortunately for Mr. Delarosa, Mr. Kinsella did not take advantage of this incident.  Mr. Kinsella was fully aware of the incident and the ramifications.  Mr. Kinsella repeatedly told Mr. Delarosa in person and by letter that he would file a motion to dismiss the case "because of outrageous government conduct."  Mr. Kinsella never filed the motion.  Mr. Kinsella was in the position to closely cross examine TFO McCoy and Agent Jusianiec but did not do so.  Despite repeated demands of Mr. Delarosa that he do so, Mr. Kinsella never used the incident and the logical arguments and conclusions during the trial.

The January 23, 2009, tape contained another issue for the defense.  During the buy itself, CI-81 is heard jabbing Donald Perkins with a "brass knuckle knife."  This occurred despite the assertion by the officers that CI-81 was searched numerous times on January 23, 2009.  This act reveals numerous very important facts.  First, the searches of CI-81 were so inadequate that each failed to reveal the presence of a weapon on the body of the CI.  The searches must be thorough enough to discover secreted drugs.  If a proper search of the CI was conducted the weapon would have surely been discovered.  Further, it demonstrates that the officers were not monitoring the conversations during the

MARK J. KELLER
ATTORNEY AT LAW

802-879-7211 | lawofficemjkeller@gmail.com | 11 Main Street, Essex Junctioin, VT 05452

actual buys.  During the post buy discussion with CI-81 and later with the officers the incident was never mentioned.

The inadequate search undercut the reliability and credibility of the buy and, one could reasonably argue, the entire investigation.  The defense did not attempt to take advantage of this during the trial.

January 14, 2010 statement

On January 14, 2010, TFO McCoy and Jusianiec accompanied by ATF Agent Maher and U.S. Probation and Parole Officer Petnaude appeared at Mr. Delarosa's store.  The government's version of the discussion is contained in ATF Report 164.  The report does not mention that Mr. Delarosa, who was represented by Attorney Daniel Stewart, told the agents that he did not want to talk to them without his attorney present.  The two agents, who separated Mr. Delarosa and themselves from Maher and Petnaude, talked right past the request, ordered Mr. Delarosa into a chair and told Mr. Delarosa that he had "no choice."  The agents continued to pressure Mr. Delarosa until he made certain incriminating statements.

Mr. Delarosa told Mr. Kinsella of the confrontation and asked him to file a motion to suppress the statement.  Mr. Delarosa wanted Mr. Kinsella to obtain Agent Maher's report on the incident (it was not furnished) and to interview Mr. Petnaude about his involvement.  Mr. Kinsella did not obtain the report, did not interview Petnaude and did not file a motion to suppress the statement.  Nor did Mr. Kinsella aggressively cross exam McCoy on the issue.

February 1, 2011 incidents

The agents violated Mr. Delarosa's or his families' Fourth Amendment rights on at least three occasions.  The agents, one of which was Agent Jusianiec, on February 1, 2011, went to Mr. Delarosa's father's residence and took photographs of the house and the van which was parked in the yard.  To obtain the photos the agents had to enter the curtilage.  Later that day, the agents went to Mr. Delarosa's store and told Mr. Delarosa's employee, Carlos Ruiz, that they were from Schenectady County Code Enforcement and that they had to take measurements of the store for tax purposes.  The agents used the lie

to obtain access to the property where they videoed the inside of the store and basement.

A similar event happened on August 29, 2010, the agents came to Mr. Delarosa's home, entered onto his property and seized his Cadillac Escalade from his driveway.  The agents did not have a warrant or any legal authority to enter Mr. Delarosa's property.

The defense was never furnished with ATF reports related to these three incidents.  Mr. Delarosa complained to Mr. Kinsella who took no action.

Santiago/Delarosa arrest

Julian Rodriquez was called as a witness to testify to establish when he began his dealing with Mr. Delarosa.  Mr. Rodriquez testified that he received a call from Mr. Delarosa about two weeks after Mr. Rodriguez's supplier was arrested and then he received a second call one to two weeks later and finally did the deal the next day.  It can clearly be established that the supplier was arrested on July 31, 2005.  Two weeks from that would be mid-August 2005.  Two weeks from that plus one day would place the sale at the end of August 2005.

The government needed the transaction to be clearly within the conspiracy time frame, 2006; Mr. Rodriquez moved his testimony.  Mr. Rodriguez testified that the first contact was early spring 2006.  The second phone call was one to two weeks later with the transaction taking place the day after the second phone call.   Mr. Rodriquez testified that he was getting cocaine from Mr. Delarosa in late winter 2006, that is around February or March 2006.  Since the arrest occurred on July 31, 2005 this testimony is nonsense.

Mr. Kinsella did not challenge the testimony of Mr. Rodriquez at trial.  Mr. Kinsella was fully aware that Pedro Santiago, who was Mr. Rodriquez's supplier, was arrested on July 31, 2005.  Mr. Kinsella should have tried to have this evidence excluded through a pretrial motion.

Identification by Mr. Luzader

Mr. Luzader gave a sworn statement to the government on June 16, 2009 that described a person named Green Eyes as a fat Puerto Rican or black.  Mr. Luzader testified that he was shown a photograph and initialed it as being Green



Eyes. Numerous legal problems should have been explored by Mr. Kinsella. The first is the obvious. Who did Mr. Luzader identify? Mr. Luzader writes, in his statement, that Green Eyes is a fat black person or a fat Puerto Rican. Mr. Delarosa does not fit that description. Mr. Luzader said he initialed the photograph. The photograph was never turned over to the defense. Where was the photograph? If it did not exist what happened to it? Mr. Kinsella did not focus on this faulty identification either in cross examination or during closing.

Identification by Zachary Grant

On June 16, 2009, Zachary Grant identified Mr. Brooker's source of supply as a person named A-Rod. Grant described A-Rod as Hispanic male, possibly Puerto Rican, approximately 5 feet 5 inches tall with a light mustache and a tattoo on his forearm that reads "Sky's the limit" or "No Limit." This was repeated during the trial. Mr. Nolan did not ask Mr. Grant to describe A-Rod during his grand jury testimony or his jury trial testimony. Mr. Kinsella did not closely cross exam Mr. Grant on his identification of Mr. Delarosa or on the location of his tattoo. Further, Mr. Kinsella did not focus on the fact that Mr. Baro has a Fly to the Limit tattoo on his forearm despite being told before the testimony that Mr. Baro had that tattoo. Mr. Baro also fit the description of A-Rod and Mr. Luzander's Green Eyes; he was 5'5, fat and a dark skinned Puerto Rican.

Disclosure of CI status and witness bias.

Assistant United States Attorney Nolan admitted that the Vermont based agents were telling persons involved in the conspiracy that Mr. Delarosa worked as a confidential informant in and around the Schenectady/Albany area and the Rutland area. As a direct result of these statements Mr. Delarosa, his wife and his children were exposed to great danger. Mrs. Delarosa received death threats and prank telephone calls. Persons drove past his house and his mother's house honking their horns and yelling threats.

The disclosure of Mr. Delarosa's informant status and the false statements of his involvement in the many of the witnesses cases created a high level of bias against Mr. Delarosa creating a motive to lie. Mr. Kinsella did not question the government witnesses on these disclosures. Such questioning would lay a

foundation for the argument that the witnessed were biased against Mr. Delarosa supplying a motive to lie.

Failure to call witnesses to testify.

Mr. Delarosa identified numerous witnesses for Mr. Kinsella supplying detailed reasons for each to testify.  Before trial Mr. Delarosa sent multiple letters asking Mr. Kinsella to call the witnesses.  Mr. Kinsella refused to call as witnesses any of the persons identified by Mr. Delarosa.  These witness are:

a      The assistant manager of Hertz to testify about the rental of the car for Evelio Baro from which $48,000 was seized.  Mr. Delarosa asked Mr. Kinsella to obtain a copy of the Hertz paperwork for the rental.  Mr. Delarosa believed that the rental paperwork would contain some geographic restriction on the use of the vehicle.

b      Lizamaris Delarosa to testify about Mr. Delarosa and the government's actions against her and the family.

c      Luz Vega would have contradicted Brian Domingo's testimony regarding the trip to Arizona with the $110,00.  Mr. Vega would have also provided testimony that Mr. Domingo put a contract to kill Mr. Delarosa because Mr. Domingo was told that Mr. Delarosa had set him up.

d      United States Probation Officer Michael Petnaude.  Mr. Petnaude would testify that Mr. Delarosa had been sent to Vermont by federal agents as part of his undercover work.

e      Sean Snaith (CI-81) would have testified that Mr. Delarosa was not his supplier and that Mr. Snaith did not know Mr. Delarosa.  Mr. Kinsella could have used Mr. Snaith's testimony to lay the proper foundation for a multiple conspiracy theory.

f      Carlos Ruiz would have testified about the incident when the agents came to Mr. Delarosa's business and said that they were agents of the county code enforcement office.

g      Angelo Gabriel Martinez worked at Mr. Delarosa's store for two years.  According to his grand jury testimony, Mr. Martinez would have testified that he did not see any indication of drug dealing during that two year period.  Mr. Martinez would also have disagreed with Mr. Domingo's testimony that Mr. Domingo, Mr. Mathis and Mr. Martinez went to New York City and bought a large



quantity of marijuana for Mr. Delarosa. Mr. Martinez would have testified that no marijuana was purchased.

h      Jaime Sangiacomo-Jackson would have testified that Mr. Robinson had repeatedly threatened her over the purchase of a vehicle.

In addition to refusing to call Mr. Delarosa's witnesses, Mr. Kinsella did not obtain records which Mr. Delarosa felt were important. The Hertz paperwork was one example. Mr. Kinsella refused to obtain Mr. Delarosa's bank records to show that Mr. Delarosa had legitimate cash flowing in and out of his business and personal bank accounts. Mr. Kinsella refused to obtain the New Hampshire motor vehicle records for the Cadillac Escalade which would have shown that Mr. Delarosa paid $8,000 for this vehicle and not the $20,000 which the witness claimed.

Reference was made in a disclosed email from Agent Maher to Agent Jusianiec that an informant on the street said the Schenectady area drug scene was dry after Mr. Lugo was arrested on January 14, 2010. Mr. Delarosa asked Mr. Kinsella to obtain any reports prepared by Agent Maher or others to support that statement. Mr. Delarosa believed that those reports would contain exculpatory evidence.

<u>Lack of preparation and/or failure to cross examine.</u>

Mr. Kinsella failed to highlight witnesses' inconsistent statements during cross examination. For instance, Mr. Herman testified at trial that he and Baro decided to end their cross country trip and keep Mr. Delarosa's money for themselves. Mr. Kinsella did not impeach Mr. Herman with his grand jury testimony where he referred to the money as "our money."

Another example was the cross examination of Brian Domingo. Mr. Kinsella could have attempted to demonstrate that Mr. Domingo was clearly biased against Mr. Delarosa. Mr. Delarosa told Mr. Kinsella prior to Mr. Domingo's cross examination that Mr. Domingo had threatened to kill Mr. Delarosa; Mr. Domingo believed, after being informed by the agents, that Mr. Delarosa set Mr. Domingo up. To confirm this threat as serious Mr. Kinsella could have questioned Mr. Domingo on his gang membership.

Mr. Kinsella did not fully cross-examine Antoine Mathis. The government disclosed that a certain gray Oldsmobile Intrigue, with a secret compartment, was impounded by the state police from June 2007 to early 2008. Nevertheless, Mr.

Mathis testified that he twice drove this vehicle to New York City to obtain drugs in July and August 2007.  Mr. Kinsella did not question Mr. Mathis on this point.  Nor did Mr. Kinsella question Mr. Mathis on whether he was a reliable witness and could accurately recall facts since Mr. Mathis is bipolar and schizophrenic.

Mr. Kinsella did not point out that Mr. Mathis version of a New York City drug trip did not correlate to Mr. Robinson's version of that alleged incident.  Mr. Mathis claimed that drugs were purchased from Mr. Pacheco but not Mr. D.  Mr. Robinson testified that the drugs were purchased from Mr. D and not Mr. Pacheco.  Mr. Kinsella could have highlighted this discrepancy more and shown that one or both were lying.

Antoine Mathis testified that Mr. Delarosa made statements to Mr. Mathis asking that Mr. Mathis to attempt to discredit a government witness.  Mr. Kinsella believed that Mr. Mathis was acting as a government agent and believed the testimony should have been excluded.  However, Mr. Kinsella did not file a pretrial motion towards that regard.

<u>Failure to aggressively object.</u>  Mr. Delarosa was brought into court from the holding area in shackles when the jury was present.  Mr. Delarosa complained to Mr. Kinsellla.  While other attorneys vocalized their objections Mr. Kinsella did not.  A juror looking in Mr. Delarosa's direction would have seen him coming from a door different from that used by the other defense members, with two men walking behind him, wearing shackles.

<u>Mr. Delarosa's own testimony.</u>

Mr. Delarosa wanted to testify on his own behalf.  Mr. Kinsella convinced Mr. Delarosa that he should not testify.  Mr. Delarosa wanted to proclaim his innocence but Mr. Kinsella told him that the government would attack his credibility and that the government would use the 2005 arrest with Mr. Santiago against him.

<u>Multiple conspiracy theory.</u>

Mr. Kinsella did not accept Mr. Delarosa's multiple conspiracy defense and failed to use CI-81 to support that theory.  Mr. Kinsella stipulated that CI-81did not have to testify.  Mr. Delarosa wanted Mr. Kinsella to use CI-81's testimony to



prove that there were multiple conspiracies.  Specifically, Mr. Delarosa wanted Mr. Kinsella to show that from the beginning of the investigation, 2008, up to and through June 2009 that Brooker, Morrison, Francis, Perkins and Flake and others had their own sources of supply.  CI-81 knew that these individuals were obtaining drugs on their own trips to New York City, Hudson, NY, Philadelphia, Poughkeepsie, etc.  Mr. Kinsella could have used CI-81 and Agent Jusianiec to prove that Mr. Delarosa had nothing to do with the investigation.

Government retribution theory.

Mr. Kinsella also refused to adopt Mr. Delarosa's government retribution theory of the case.  Mr. Delarosa told Mr. Kinsella that the government was extremely upset when someone leaked information to Brooker and others that they were to be indicted.  When Brooker refused to identify the leak the government assumed that Delarosa somehow obtained the information through his close contact with Agent Arp.  The government then turned on Mr. Delarosa and did everything in its power to build a case against him and convict him of conspiracy.  The government was willing to take most any step to get witnesses to testify.  It biased the witnesses against Mr. Delarosa by telling them that he was a CI and a rat.  The government ignored evidence inconsistent with guilt, like the description of the supplier as being fat and black or fat and Puerto Rican or 5'5" when Mr. Delarosa is thin and 5'11.

Mr. Kinsella did not aggressively attack the government agents.  Mr. Kinsella did not closely cross examine Agent Arp on whether Mr. Delarosa was sent to Vermont.  When DEA agent Ronald Arp testified that he did not send Mr. Delarosa to Vermont to work undercover Mr. Kinsella had the obligation to cross examine him on that issue and then call U.S.P.O. Petnaude to testify that he had contemporaneously spoken to Mr. Delarosa about the Vermont trips in 2007.   Mr. Petnaude sent an email in 2010 confirming that Mr. Delarosa made trips to Vermont for the government in 2007.

Breakdown of the attorney/client relationship.

Mr. Kinsella and Mr. Delarosa disagreed on the theory of the case and the identity of the witnesses to testify.  As the trial progressed Mr. Delarosa grew more frustrated with Mr. Kinsella and his refusal to proceed in a manner



802-879-7211 | lawofficemjkeller@gmail.com | 11 Main Street, Essex Junctioin, VT 05452

acceptable to Mr. Delarosa.  The breakdown in their attorney client relationship resulted in at one heated outburst and made it difficult or impossible for the two men to communicate with each other effectively.

Relief Requested:

    Mr. Delarosa argues that he received ineffective assistance of counsel. The legal standard applicable to this claim is clear.

> A defendant's Sixth Amendment right to counsel is violated when he receives ineffective assistance. To prove such ineffective assistance, a defendant must show: (1) " that counsel's representation fell below an objective standard of reasonableness"; and (2) " that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir .2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct 2052, 80 L.Ed.2d 674 (1984)).

*United States v. Brown*, 623 F. 3d 104, 112 (2nd. Cir. 2010).

    Mr. Delarosa requests an evidentiary hearing so that he may present evidence consistent with the assertions contained in this motion. Mr. Delarosa is confident that if such a hearing is held the court will conclude that Mr. Kinsella did not provide Mr. Delarosa with effective assistance.  While these matters are usually the subject of post conviction relief hearings there is authority to conduct this hearing before the entry of judgment. In 2010 the United States Court of Appeals for the Second Circuit reversed a district court's refusal to hear Mr. Mark's ineffective assistance of counsel claim which was raised after hearing but before sentencing.

> As a matter of first impression, we hold that when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding.  We are mindful that district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of such claims prior to judgment, including principally the potential disruption of the proceedings, especially if the attorney against whom the complaint is directed continues at the time to represent the defendant. The decision to interrupt the pre-

judgment proceedings to inquire into the merits of an ineffective assistance of counsel claim may depend on, among other things, whether the court would need to relieve the defendant's attorney, or in any event, to appoint new counsel in order to properly adjudicate the merits of the claim.

> In this case, we have no trouble concluding that the district court should have considered Marks's claim prior to the imposition of the sentence. By late April 2007, the court had relieved Thompson as Marks's attorney, and at that point had no good reason to postpone inquiry into the merits of Marks's claim.

*Id*. p. 113.

Mr. Delarosa's case is similar to Mr. Mark's situation in *Brown*. The trial attorney has been replaced and specific assertions of ineffective assistance of counsel has been alleged. Therefore, Mr. Delarosa respectfully requests that the court conduct a hearing on this issue.

**Newly Discovered Evidence**

<u>Grant Identification</u>

In what would be considered to be newly discovered evidence, the defense spoke with an individual who was incarcerated for approximately one week with both Mr. Delarosa and Mr. Grant after Mr. Delarosa's trial. Mr. Grant had testified at that trial that he knew who Mr. Delarosa was. Mr. Delarosa told his attorney repeatedly that he did not know Grant and had never seen him before.

While in the facility Mr. Delarosa and Mr. Grant were in different units. The units, however, ate together and took recreational time together. Mr. Delarosa immediately recognized Mr. Grant as a witness who testified against him. During the testimony Mr. Grant positively identified Mr. Delarosa. When it appeared to Mr. Delarosa that Mr. Grant did not recognize him Mr. Delarosa enlisted the assistance of the other inmate to witness Mr. Grant's reactions. With the inmate watching, Mr. Delarosa frequently ate his meals directly across from Mr. Grant and during recreation Mr. Delarosa frequently walked near or stood by Mr. Grant. Despite being in close proximity on numerous occasions Mr. Grant never recognized Mr. Delarosa. Clearly strange behavior for a person who testified at

the trial that could clearly identified Mr. Delarosa.  A reasonable conclusion is that Mr. Grant lied when he testified that he could identify Mr. Delarosa.

Luis Rivas testimony.

After the trial Luis Rivas provided a taped statement to Mr. Delarosa's spouse regarding his trial testimony.  Mr. Rivas said that he testified for two reasons.  First, as with others, Mr. Rivas was told by government agents that Mr. Delarosa had set up Mr. Rivas and told the DEA Mr. Rivas' every move.  Mr. Rivas also said that he testified after being threatened by government agents with a lengthly sentence of incarceration unless he testified in the manner he was instructed.

*The Relief Requested*.

The Federal Rules of Criminal Procedure allow the district court, upon the defendant's motion, to " grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a).  The standard for the grant of such a motion requires that

> (1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.  *United States v. Owen*, 500 F.3d 83, 87-88 (2d Cir.2007) cert. denied, 552 U.S. 1237, 128 S.Ct. 1459, 170 L.Ed.2d 287 (2008). " The 'ultimate test' is ' whether letting a guilty verdict stand would be a manifest injustice.... There must be a real concern that an innocent person may have been convicted.' " *United States v. Canova*, 412 F.3d 331, 349 (2d Cir.2005) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

*United States v. Persico*, 645 F.3d 85, 105 (2nd Cir. 2011)

The newly discovered evidence satisfies the five requirements of the above quoted test.  The evidence was not discovered until after the trial.  While Mr. Delarosa believed that both Mr. Grant and Mr. Ruiz were lying during their testimony he was without a sufficient evidence to prove that belief.  Since the evidence goes directly to the identification of two of the government witnesses

the evidence is material nor is the evidence cumulative.  The government bolstered each of its witnesses with the testimony of the others.  A deficiency on one witness's testimony would weigh down the other witnesses' testimony.  While a reasonable argument may be made that the newly discovered evidence is only impeaching and would not result in an acquittal, the newly discovered evidence should be viewed together with the ineffective assistance of counsel claim.

**Rule 29 Claim**

The standard for a judgment of acquittal under Rule 29 is set forth in the rule: "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a).

> The test for sufficiency is whether, as to a given count, a " rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.2003) ("*Jackson* " ). The district court must make that determination with the evidence against a particular defendant viewed in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.

*United States v. Persico*, 645 F. 3d 85, 104 (2nd. Cir. 2011).

Mr. Delarosa reasserts the arguments set forth during the trial on this issue.  In addition, Mr. Delarosa asks the court consider this issue together with the newly discovered evidence and the ineffective assistance of counsel claims.

Dated:  March 2, 2012              /s/ Mark J. Keller
                                   Mark J. Keller

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA                CRIMINAL NO:  1:09-000064-020

    V

NOEL DELAROSA

CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2012, I electronically filed with the Clerk of Court the following document(s):

Motion for New Trial

using the CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF) to the following NEF parties:

AUSA Craig Nolan

| Dated:  March b2, 2012 | /s/ Mark J. Keller |
|---|---|
| | Mark J. Keller |
| | Law Office of  Mark J. Keller |
| | 11 Main Street |
| | Essex Junction, VT |
| | lawofficemjkeller@gmail.com |



802-879-7211 | lawofficemjkeller@gmail.com | 11 Main Street, Essex Junctioin, VT 05452

